850 F.2d 1038
 UNITED STATES of America, Plaintiff-Appellee,
v.
Henry HAMILTON, Jr., Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Geraldine HAMILTON, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ethel HAMILTON, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Charles BLAKE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Thomas BROWN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Anthony Jerome WASHINGTON, a/k/a Kojak, Defendant-Appellant.
 Nos. 87-5100 to 87-5105.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 5, 1988.
Decided June 29, 1988.
Rehearing and Rehearing In Banc Denied Sept. 7, 1988.
 
 Capers Gamewell Barr, III, John Frank Hardaway (Lionel S. Lofton, Michael P. O'Connell, Stuart A. Feldman, David P. McCann, on brief), for defendants-appellants.
 John Michael Barton, Asst. U.S. Atty. (Vinton D. Lide, U.S. Atty., J. Anthony Mabry, Third Year Law Student, on brief), for plaintiff-appellee.
 Before HALL, MURNAGHAN and SPROUSE, Circuit Judges.
 K.K. HALL, Circuit Judge:
 
 
 1
 This is a consolidated appeal from the district court's determination that the government met its burden of presenting racially neutral explanations for the use of its peremptory challenges during the selection of the jury for defendants' trial. The district court, after an evidentiary hearing, found that the defendants had established a prima facie case of purposeful discrimination, but that the government's reasons for using its peremptory challenges satisfied the standards expressed in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). We affirm.
 
 I.
 
 2
 The background of this controversy has been set out in our earlier opinion in this case. United States v. Blake, 819 F.2d 71, 72-73 (4th Cir.1987). A brief review, however, may be helpful for this discussion.
 
 
 3
 Henry Hamilton, Jr., Geraldine Hamilton, Ethel Hamilton, Charles Blake, Thomas Brown, and Anthony Jerome Washington, all of whom are black, were indicted with eight other black individuals for various drug-related violations in the early part of 1985. During the voir dire proceedings prior to their trial, the government used seven of its eight peremptory challenges to strike black persons from the venire. The district court denied defendants' motion for mistrial, ruling that the defendants had failed to show the systematic exclusion of blacks from juries in a number of cases as required by Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Trial proceeded and all defendants were convicted.
 
 
 4
 While defendants' case was pending on appeal, Swain was substantially modified by Batson. In Swain, the Supreme Court had recognized that a "State's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause." 380 U.S. at 203-204, 85 S.Ct. at 826. Swain suggested that an inference of purposeful discrimination would be raised when there was evidence that a prosecutor, "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries." 380 U.S. at 223, 85 S.Ct. at 837. Batson rejected this harsh evidentiary formulation as being "inconsistent with standards that have been developed since Swain for assessing a prima facie case under the Equal Protection Clause." 106 S.Ct. at 1721.
 
 
 5
 This Court heard oral arguments on the case in June, 1986, but delayed a decision pending the Supreme Court's ruling in Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), on whether Batson was to be applied retroactively. In Griffith, the Supreme Court held that Batson applied retroactively to all cases pending on direct appeal at the time Batson was issued. Accordingly, we reversed and remanded this case to the district court with instructions that it determine:
 
 
 6
 whether the appellants have established a prima facie case of purposeful discrimination. If so, the court should conduct an evidentiary hearing on the Government's reasons for using its peremptory challenges to exclude the seven black veniremen. If the Government's reasons fail to satisfy the Batson standards, appellants must be granted a new trial. If the reasons satisfy Batson, appellants' convictions should be reinstated.
 
 
 7
 On remand, the district court determined that the government's exercise of its seven peremptory challenges to strike blacks from the jury created a prima facie case of purposeful discrimination. After an evidentiary hearing, the court concluded, however, that the government's reasons for challenging these jurors was racially neutral. This appeal followed.
 
 II.
 
 8
 On appeal, appellants contend that (1) the district court erred in holding that the government met its burden to present a neutral explanation for challenging black jurors; (2) the Equal Protection Clause, as interpreted in Batson, prohibits peremptory challenges against jurors because they are women; and (3) a prosecutor's use of peremptory challenges to exclude women from a criminal petit jury, because of their sex, violates the rights of a defendant to an impartial jury and to a jury drawn from a cross-section of the community under the sixth and fourteenth amendments. We disagree with each contention and address them seriatim.
 
 
 9
 It is clear today that, after Batson, a black defendant may make out a case of purposeful discrimination "by showing that the totality of the relevant facts [in his particular case] gives rise to an inference of discriminatory purpose." 106 S.Ct. at 1721. "Once the defendant makes the requisite showing, the burden shifts to the State to explain adequately the racial exclusion." Id. The Supreme Court emphasized that, while the prosecutor "must articulate a neutral explanation [for challenging black jurors] related to the particular case to be tried ... the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause." Id. at 1723. Moreover, the presence or absence of intentional discrimination is a finding of fact ordinarily entitled to great deference by a reviewing court. Anderson v. Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).
 
 
 10
 At the evidentiary hearing held on June 23, 1987, the trial court determined that a prima facie case of racial discrimination had been established by the government's exercise of seven peremptory challenges on black jurors. After the trial court found an inference of purposeful discrimination, the government came forward and offered its explanations for all seven peremptory strikes. After weighing the credibility of the United States Attorney who had exercised the strikes, the district court then found that the government had offered legitimate, racially neutral explanations for challenging these black jurors. We see no basis for disturbing these conclusions.
 
 
 11
 In this case, the jury of twelve was drawn from a panel of fifty. Of those fifty jurors, nineteen were white males, nineteen were white females, eleven were black females, and one was a black male. For the selection of the primary jury, the government was allowed eight peremptory strikes, while the defendants were given fourteen peremptory challenges.[1] At the time the jury was selected, nine of the defendants were male and five defendants were female. During the jury selection process, the government exercised seven of its eight available strikes on blacks, while the defendants used thirteen of their fourteen peremptory challenges to strike whites from the panel. Neither the government nor the defendants exercised their last peremptory strikes. Of the twelve jurors which were eventually seated, six were white females, three were black females, and three were white males. The appellants have conceded that the first four strikes exercised by the government were based on reasons unrelated to race. Therefore, our inquiry is limited to the propriety of the fifth, sixth and seventh peremptory challenges.
 
 
 12
 The government offered the same explanation for exercising all three strikes: it wanted more men on the jury; therefore jurors Nos. 54, 53 and 56 were struck because they were female. The government explained that since five of the fourteen defendants were women, it wanted to take steps to insure that a jury would not be overly sympathetic to the female defendants who allegedly participated in the illegal drug distribution network.
 
 
 13
 At the time juror No. 54, a black female, was presented, five females and one male had been seated. The government's explanation that it struck this juror because it felt it needed more men on the jury is certainly reasonable. Although the government then accepted two white females, Nos. 38 and 31, it had independent information that these two individuals would be good jurors.
 
 
 14
 The composition of the jury when juror No. 53, also a black female, was presented, was seven females and one male. According to the government, it had no independent information on this juror and knew, by this time, that the defendants had established a pattern of striking white jurors while seating blacks.[2] Again, the government's contention that this juror was struck because she was female is reasonable.
 
 
 15
 The government's last peremptory challenge was exercised to remove juror No. 56, still another black female. By this time, the composition of the jury was nine females and one male. Moreover, the record shows that counsel for the defendants had exercised 13 of their 14 strikes on whites. Certainly the government was justified in believing that it was unlikely that defendants would strike this juror. The government's explanation that it struck juror No. 56 because she was a female is reasonable, and, if believed by the trial court, would rebut the presumption that the peremptory challenge was exercised in a racially discriminatory manner.
 
 
 16
 The aforementioned discussion of the jury selection in this case, and the prosecutors' explanations, provide a sound basis for concluding that the government exercised its fifth, sixth, and seventh peremptory challenges on the basis of sex, not race. Furthermore, the trial court made specific findings of fact that race played absolutely no part in the jury selection process. Applying the Anderson standard, we conclude that the trial court's determinations were not clearly erroneous.III.
 
 
 17
 We reject appellants' suggestion that the Equal Protection Clause compels us to extend Batson to apply to peremptory challenges exercised on the basis of gender. While we do not applaud the striking of jurors for any reason relating to group classifications, we find no authority to support an extension of Batson to instances other than racial discrimination.[3]
 
 
 18
 In Strauder v. West Virginia, 100 U.S. (10 Otto) 303, 25 L.Ed. 664 (1880), the Supreme Court emphasized that the primary concern of the Equal Protection Clause was to eliminate governmental discrimination due to race. The Strauder Court struck down a state statute which prohibited black men from serving on juries, recognizing that racial discrimination in the judicial system is "a stimulant to that race prejudice which is an impediment to securing to [black citizens] that equal justice which the law aims to secure to all others." 100 U.S. (10 Otto) at 308. The Court in Swain reaffirmed this basic principal:
 
 
 19
 For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government.
 
 
 20
 85 S.Ct. at 827.
 
 
 21
 Although the Court in Batson relaxed the evidentiary burden of Swain, it offered no intimation that it was extending the equal protection safeguards involving peremptory strikes to gender: "By requiring trial courts to be sensitive to the racially discriminatory use of peremptory challenges, our decision enforces the mandate of equal protection and furthers the ends of justice." 106 S.Ct. at 1724 (emphasis added). While the strictures of the Equal Protection Clause undoubtedly apply to prohibit discrimination due to gender in other contexts, there is no evidence to suggest that the Supreme Court would apply normal equal protection principles to the unique situation involving peremptory challenges.
 
 
 22
 Peremptory challenges enable "counsel to ascertain the possibility of bias through probing questions on the voir dire and ... [facilitate] the exercise of challenges for cause by removing the fear of incurring a juror's hostility through examination and challenge for cause." Swain, 380 U.S. at 219-20, 85 S.Ct. at 835. "Common human experience, common sense, psychosociological studies, and public opinion polls tell us that it is likely that certain classes of people statistically have predispositions that would make them inappropriate jurors for particular kinds of cases.... [T]o allow this knowledge to be expressed in the evaluative terms necessary for challenges for cause would undercut our desire for a society in which all people are judged as individuals and in which each is held reasonable and open to compromise." Batson, 106 S.Ct. at 1735-36 (C.J. Burger, joined by J. Rehnquist, dissenting) (quoting Babcock, Voir Dire: Preserving "Its Wonderful Power," 27 Stan.L.Rev. 545, 553-554 (1975)). Thus, in the peremptory challenge we have "a system that allows the covert expression of what we dare not say but know is true more often than not." Id.
 
 
 23
 Clearly, if the Supreme Court in Batson had desired, it could have abolished the peremptory challenge or prohibited the exercise of the challenges on the basis of race, gender, age or other group classification. A careful examination of the Batson opinion, however, leads this Court to the firm conclusion that, in light of the important position of the peremptory challenge in our jury system, the Court intended Batson to apply to prohibit the exercise of peremptory challenges on the basis of race only.
 
 IV.
 
 24
 Finally, we have little trouble holding that appellants' claim that they were denied the right to be tried by an impartial jury and to a jury drawn from a fair cross-section of the community, in violation of the sixth and fourteenth amendments is without merit. While recognizing that the Equal Protection Clause prohibits racial discrimination in jury selection, the Supreme Court "[has] never invoked the fair cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large." Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 1764, 90 L.Ed.2d 137 (1986). As the Court noted in Lockhart, "an extension of the fair cross-section requirement to petit juries would be unworkable and unsound." Id. 106 S.Ct. at 1765. We therefore decline appellants' "invitation to adopt such an extension." Id.
 
 
 25
 For the foregoing reasons, the decision of the district court is affirmed.
 
 
 26
 AFFIRMED.
 
 MURNAGHAN, Circuit Judge, dissenting:
 
 27
 "Circumstances alter cases." That is surely an overworked cliche, but it also is a truism and its truth is abundantly present here. The striking of a petit jury is the focal point of the question with which we are presented. The original venire, after the court had struck for cause, consisted of fifty potential jurors, of which only one was a black male.[1] The other venire persons were nineteen white males, nineteen white females and eleven black females.
 
 
 28
 The ordinary, customary way of procedure was commenced with potential jurors being singly considered and either accepted or struck peremptorily. The process continued until six places (one white male, two white females, three black females) were filled, leaving six places remaining to be filled on the jury, as well as two places as alternates thereto. The government had utilized four of its eight peremptory challenges to strike three black women and one black man. The defendants had, in turn, struck six white men and two white women.
 
 
 29
 At that point, there were twelve white men, fifteen white women, and five black women remaining from whom the selection of jurors and alternates still to be selected could be made. The prosecution had left four peremptory challenges, the defense had six. By that time, there were no black men left on the venire. An important new consideration was introduced when the prosecutor, according to his testimony, decided to strike three black women jurors. His reason, as expressed by him, was to minimize or correct an imbalance by which too many women were selected for the jury. The argument, however, is completely wanting in rationality or validity because only black women[2] were struck while no white women[3] were. The sole black man on the venire panel had already been struck. So striking black women could only enhance the number of white men and white women on the petit panel. The announced objective could have been equally as well achieved by strikes of white women as by strikes of black women.
 
 
 30
 The prosecution attempts to argue that it felt entitled at this point to strike only black women because it could count on the defendants to strike white persons. However, such a poor excuse, namely, that you could do wrong on the assumption that the wrong would be eliminated, matched or nullified by a similar wrong on the part of the other party, will not wash. See Batson v. Kentucky, 476 U.S. 79, 89 n. 12, 106 S.Ct. 1712, 1718 n. 12, 90 L.Ed.2d 69 (1986) (limiting prosecutor's exercise of peremptory challenges while expressly refusing to address the issue of whether the Constitution imposes any limit on the defense counsel's exercise of peremptory challenges). In short, two wrongs do not make a right. While there was no doubt that there was discrimination as to women, that did not excuse conduct that was also racially as well as sexually discriminatory. The discriminatory behavior was a case of "racially and sexually discriminatory" not of "either racially or sexually discriminatory."
 
 
 31
 Here, the fact was that the prosecution used seven out of eight peremptory challenges, the only ones it exercised, against black jurors[4] and it struck three black women while not challenging six white women. Indeed, the prosecutor's own comments regarding some of the venire persons highlight his purposeful discrimination. The government introduced testimony that some of the black women it struck were more favorable for the prosecution than some of the white women it seated. Whatever the reasons advanced by the prosecution, the three black women were struck because they were black. Consequently, I would vacate the judgments of conviction and remand the case for a new trial.
 
 
 32
 The result I would reach renders it unnecessary to consider the question to which the briefs were extensively directed of whether Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which, on Equal Protection grounds, forbids purposeful exclusion of blacks, extends by analogy to exclusion of women.[5] The prosecution concedes that it exercised gender discrimination in the selection of the petit jury. However, the discrimination here was, if sexual, also indubitably racial. If the question had involved a venire panel made up exclusively of males, and there were three black males among them and all three blacks (admittedly otherwise preferable to the prosecution, aside from the issue of race) were struck by the prosecution while whites were chosen for all open places, it is hard to imagine a court which would not perceive a racial discrimination in such circumstances. "Vive la difference" is a phrase and here is one case where a female is entirely the equal of the male and entitled to equal treatment on racial grounds.
 
 
 33
 I, therefore, dissent.
 
 
 
 [1]
 Appellants do not challenge the peremptory strikes exercised by the government in selecting the alternate jurors
 
 
 [2]
 While the Supreme Court has expressed no views on whether the Constitution prohibits a defendant from exercising peremptory challenges in a racially discriminatory manner, we note that this may be one factor to consider when assessing the government's explanation for exercising its peremptory strikes. See Batson, 106 S.Ct. 1712, 1718 n. 12
 
 
 [3]
 In Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), the Supreme Court held that the systematic exclusion of women from jury panels violated the sixth and fourteenth amendments. In that case, the Court struck down a Louisiana jury selection system in which a woman would not be selected for jury service unless she had previously filed a written declaration of her desire to be subject to jury service. The effect of this system was that only a few women, grossly disproportionate to the number of women in the community eligible to serve, were ever called for jury service. Taylor, however, is readily distinguishable from the principal case. Here, there has been no claim that women have been systematically excluded from the venire. In fact, of the fifty jurors on the original panel, thirty were female. Moreover, of the twelve jurors seated, nine, or 75%, were women
 
 
 [1]
 The one other black male venire member had unaccountably disappeared and could not be located
 
 
 [2]
 Three out of the potential five
 
 
 [3]
 Out of fifteen remaining potential jurors who were white females
 
 
 [4]
 The government expresses pride in pointing out that it did not exercise all of its peremptory challenges. It relies on the fact that it left one peremptory challenge unexercised to support its contention that the government did not exclude from the jury all the blacks that it could have, had the prosecution been motivated by a racially discriminatory purpose. I find such explanation to be unpersuasive. Indeed, when the government exercised its seventh peremptory challenge, there were two black venire persons left who might possibly be picked. The mere fact that it did not use its last challenge meant only that the government was saving the challenge just in case another black venire person came up. In fact the next two choices were white men who were seated, completing the jury selection, making exercise of the last challenge by the government not only unnecessary, but a reason not to strike because striking, by requiring consideration of other potential jurors, including the remaining two black women, might make selection of a black more possible. In short, that eighth challenge, while not exercised, did serve its purpose and was used as an insurance policy to keep blacks off the panel
 
 
 [5]
 The result also renders it unnecessary to consider the question of whether the prosecutor's use of peremptory challenges to excuse women violates the Sixth Amendment right to a jury that represents a fair cross section of the community