**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Juana Espericueta DE GROSS,**
**Defendant–Appellant.**

No. 87–5226.

United States Court of Appeals,
Ninth Circuit.

Argued En Banc and
Submitted Sept. 26, 1991.

Decided April 2, 1992.

---

Edmundo Espinoza, San Diego, Cal. on brief, for defendant-appellant.

William Braniff, U.S. Atty., San Diego, Cal., for plaintiff-appellee.

Judy Clarke, McKenna & Cuneo, Mario G. Conte and Sara Rapport, Federal Defenders of San Diego, Inc., San Diego, Cal., for amicus curiae Nat. Ass'n of Crim. Defense Lawyers.

Betty Wheeler, ACLU Foundation of San Diego, San Diego, Cal., for amicus curiae American Civil Liberties Union.

Before: WALLACE, Chief Judge, HUG, TANG, SCHROEDER, ALARCON, D.W. NELSON, REINHARDT, BEEZER, WIGGINS, RYMER, FERNANDEZ, Circuit Judges.

WIGGINS, Circuit Judge:

A jury convicted Juana Espericueta De Gross of aiding and abetting the transportation of an alien within the United States. De Gross appealed her conviction. A panel of this court reversed her conviction. 913 F.2d 1417. The panel's judgment was vacated, however, by our decision to rehear this case en banc. 930 F.2d 695. Now, after supplemental briefing and argument by the parties and by amicus curiae, we once again determine to reverse the judgment of the district court.

## BACKGROUND

De Gross pled not guilty to three counts of aiding and abetting the transportation of an alien within the United States. During voir dire, the government objected to De Gross' peremptory challenge of Wendell Tiffany, a male venireperson. At that point, De Gross had peremptorily struck[1]

---

1. For purposes of clarity, we refer to a party's attempt to excuse a venireperson as a perempto-

seven male venirepersons. The government argued that this pattern of striking males established De Gross' discriminatory intent to exclude male venirepersons in violation of their constitutional rights to equal protection of the laws. The district court ruled that the government had established a prima facie case of purposeful discrimination, and required De Gross to justify her challenge. De Gross offered no explanation. The court then disallowed her peremptory challenge of Tiffany.

De Gross also made an equal protection objection during voir dire. De Gross objected to the government's challenge of Herminia Tellez, a Hispanic woman. Tellez was then the only Hispanic on the venire.[2] The district court ruled that De Gross established a prima facie case of discrimination, and required the government to justify its challenge. Government counsel responded that his main reason for challenging Tellez was to achieve "a more representative community of men and women on the jury."[3] The court accepted the government's explanation and struck Tellez.

The impaneled jury, consisting of three men, including Tiffany, and nine women, convicted De Gross of the crimes charged. De Gross timely appealed.

## STANDARD OF REVIEW

■ Whether equal protection principles prohibit a party from peremptorily striking venirepersons on the basis of gender is a question of law that we review de novo. *United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

## DISCUSSION

I. De Gross' Challenge of Tiffany

De Gross argues that the district court erred in denying her peremptory challenge

of Tiffany, a male venireperson. At trial, the government had objected to De Gross' challenge on the ground that De Gross exercised it with discriminatory intent, and therefore, if the district court struck Tiffany, it would violate Tiffany's equal protection rights. We first must decide whether the government has standing to make this objection. If so, we must decide whether equal protection principles prohibit a criminal defendant from peremptorily striking a venireperson on the basis of gender. If equal protection principles do prohibit such conduct, we must decide finally whether De Gross did exercise her peremptory challenge with discriminatory intent.

A. *The Government's Standing to Object to De Gross' Peremptory Challenge*

De Gross argues that the government lacks standing to object to her use of peremptory challenges. The government argues that it has standing based on its own injury and the injury to the venirepersons challenged. We find both of the government's arguments persuasive.

Discriminatory practices in jury selection "cast[s] doubt on the integrity of the whole judicial process. They create the appearance of bias in the decision of individual cases, and they increase the risk of actual bias as well." *Peters v. Kiff,* 407 U.S. 493, 502–503, 92 S.Ct. 2163, 2168, 33 L.Ed.2d 83 (1972). The exclusion of cognizable groups from jury service limits community participation in the administration of the criminal justice system—participation which is "critical to public confidence in the fairness" of the system. *Taylor v. Louisiana,* 419 U.S. 522, 530, 95 S.Ct. 692, 698, 42 L.Ed.2d 690 (1975).

■ As administrator of the criminal justice system, the government has an inter-

ry challenge. Where the district court accepts the party's challenge and excuses the venireperson, we call that a peremptory strike or a successful peremptory challenge.

**2.** The record indicates that there may have been another Hispanic on the venire, but the judge excused her earlier for cause.

**3.** At that point, ten women and two men were seated in the jury box, and the remainder of the venire contained six women and one man.

est in having its criminal prosecutions tried before a tribunal most likely to produce a fair result. *Singer v. United States*, 380 U.S. 24, 36, 85 S.Ct. 783, 790, 13 L.Ed.2d 630 (1965). Thus, when a criminal defendant attempts to achieve a jury partial to her through discriminatory peremptory strikes, the government suffers injury. We view this injury as sufficient to confer standing upon the government to object to the defendant's challenge.

 Furthermore, the government has standing to object to a defendant's discriminatory peremptory challenge by asserting the equal protection rights of the venireperson sought to be excluded. Ordinarily, a party does not have standing to assert the legal rights or interests of another. *Powers v. Ohio*, —— U.S. ——, 111 S.Ct. 1364, 1370, 113 L.Ed.2d 411 (1991). There are, however, limited exceptions. A party may raise a third party's rights or interests when (1) the party asserting the rights has suffered an injury in fact, giving him a sufficiently concrete interest in the outcome of the litigation, (2) there is a sufficiently close relationship between the litigant and the person whose rights are being asserted so that the litigant will be an effective proponent of the rights being litigated, and (3) there is some hindrance to the third party's ability to protect his own interests. *Id.* 111 S.Ct. at 1370–1372. Using these three criteria, *Powers* established that a criminal defendant has standing to raise the equal protection rights of a juror who was improperly excluded even if the defendant is not of the same racial group as the juror. *Id.* at 1373.

In *Powers*, the Court held that the defendant had standing because the defendant is actually injured by the improper exclusion. Racial discrimination in the jury selection process casts doubt on the integrity of the judicial process and the fairness of the criminal proceeding. *Id.* at 1371. Second, the defendant will be as effective at advocating the juror's rights as the juror himself would be because both have a common goal in eliminating racism, and the defendant will be motivated by the possibility of

reversal of a conviction. *Id.* at 1372. Finally, the excluded juror is unlikely to have the opportunity or incentive to vindicate his or her own rights. *Id.* at 1372–73.

This reasoning is equally applicable when the government asserts standing to raise the equal protection rights of improperly excluded jurors. First, as we have stated above, violation of the venireperson's rights injures the government by impugning the jury system.

Second, the government's relationship to the venireperson is sufficient to ensure that it will vigorously defend his rights. *See Singleton v. Wulff*, 428 U.S. 106, 114–15, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976). The government has a direct interest in protecting the rights of its citizens, including potential jurors. Additionally, the government has an interest in a venireperson's perception of the fairness and impartiality of the criminal justice system.

 Finally, several obstacles hinder an excluded venireperson from asserting his own rights. *See id.* at 115–16, 96 S.Ct. at 2874–75. The venireperson may not be aware that he has been discriminated against. Such discrimination may not become apparent until a number of similarly situated venirepersons have been struck. Also, although the racially excluded juror may bring a challenge on his or her own behalf,[4] the reality is that such suits are rarely brought. *Powers*, 111 S.Ct. at 1372. "The barriers to a suit by an excluded juror are daunting." *Id.* at 1373. There are numerous procedural difficulties. Additionally, there is little incentive because of the small financial stakes and the expense of litigation. *Id.* Thus, the improperly excluded juror effectively lacks a remedy for his unconstitutional exclusion from the trial.

We therefore conclude that the government has standing to object to De Gross' peremptory challenge of Tiffany under these circumstances.

## B. Gender–Based Peremptory Challenges

 In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the

---

4. *Carter v. Jury Comm'n of Greene County*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970).

Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prohibits a prosecutor from peremptorily striking a venireperson on the basis of his race. Equal protection principles forbid racially discriminatory peremptory strikes, in part because racial discrimination during jury selection (1) harms the excluded venirepersons, (2) undermines public confidence in the judicial system, and (3) stimulates community prejudice. *Id.* at 87; 106 S.Ct. at 1718. Because all of these evils also result from peremptory strikes based on gender, the Fifth Amendment's equal protection principles [5] compel us to prohibit peremptory strikes on the basis of gender.[6]

■ A prosecutor's sexually discriminatory peremptory strike also violates the defendant's right to equal protection of the laws because the defendant is entitled to be tried by a jury chosen pursuant to nondiscriminatory criteria. *Batson,* 476 U.S. at 86–87; 106 S.Ct. at 1717–18.[7]

First, just as racial discrimination in the judicial system is a stimulant to community prejudice which impedes equal justice for racial minorities, *Id.* at 87–88, 106 S.Ct. at 1718, so too is gender discrimination in the judicial system a stimulant to community prejudice which impedes equal justice for women. *See Personnel Administrator v. Feeney,* 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979) (like classifications based on race, gender classifications traditionally have been the touchstone for pervasive and often subtle gender discrimination).

The history of juries in the United States is one of pervasive, government sanctioned exclusion of women. At common law, women were excluded from juries based on the doctrine of *propter defectum sexus,* literally, the "defect of sex." 2 William Blackstone, *Commentaries* \* 362. In 1880, the Supreme Court declared the exclusion of blacks from jury service to be unconstitutional, but noted that such service might be limited to men. *Strauder v. West Virginia,* 100 U.S. 303, 310, 25 L.Ed. 664 (1880). In *Hoyt v. Florida,* 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961), the Supreme Court held that excluding women from jury service was neither a due process nor an equal protection violation because there was a sufficient rational basis for it—that women are "still regarded as the center of home and family life." *Id.* at 62, 82 S.Ct. at 162. It was not until 1975 that the Supreme Court held that systematically excluding women from juries violates defendants' Sixth Amendment rights. *See Taylor,* 419 U.S. at 536, 95 S.Ct. at 700. Permitting gender-based peremptory challenges would simply affirm an erroneous and unconstitutional presumption that women are less qualified than men to serve as jurors.

■ Furthermore, gender discrimination, like racial discrimination, violates the defendant's equal protection rights. Under *Batson,* a defendant is entitled to be tried by a jury chosen in a nondiscriminatory manner.[8]

---

5. *Batson* involved a state defendant and thus engaged in equal protection analysis pursuant to the Fourteenth Amendment. This case involves a federal defendant, and thus our equal protection analysis is based on the Due Process Clause of the Fifth Amendment.

6. We note that the Fourth Circuit did not come to this conclusion. *See United States v. Hamilton,* 850 F.2d 1038, 1042 (4th Cir.1988) (prosecutor's gender related explanation for striking venirepersons was a neutral one because "no authority ... support[ed] an extension of *Batson* to instances other than *racial* discrimination"), *cert. dismissed, sub nom. Washington v. United States,* 489 U.S. 1094, 109 S.Ct. 1564, 103 L.Ed.2d 931 (1989), *cert denied,* 493 U.S. 1069, 110 S.Ct. 1109, 1110, 107 L.Ed.2d 1017 (1990). In so holding, *Hamilton* relied upon the fact

that the Court's language was couched in racial terms. We believe that there is no more significance to that language than the fact that the case involved peremptory strikes against black venirepersons. *Batson's* rationale applies equally well to gender-based peremptory strikes.

7. *See* section I.C. of this opinion for a discussion of the harms to the potential juror and the government of the defendant's sexually discriminatory exercise of peremptories.

8. The fact that gender-based discrimination is an equal protection violation is critical to our analysis. It distinguishes race and gender from other factors that are not improper bases for exclusion from juries, for example, one's occupation.

Peremptory strikes based on gender, like those based on race, harm the excluded venireperson because discriminatory strikes are not based upon an individual's qualifications. *Id.* Just as "[a] person's race simply 'is unrelated to his fitness as a juror,'" *id.* 476 U.S. at 87, 106 S.Ct. at 1718 (quoting *Thiel v. Southern Pac. Co.,* 328 U.S. 217, 227, 66 S.Ct. 984, 989, 90 L.Ed. 1181 (1946) (Frankfurter, J., dissenting)), so too is a person's gender unrelated to her ability to serve as a juror. *Taylor,* 419 U.S. at 537, 95 S.Ct. at 701. Gender bears no relationship to an individual's ability to perform or contribute to society. *See Frontiero v. Richardson,* 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973) (Brennan, J., announcing the judgment of the Court).

Additionally, full community participation in the administration of the criminal justice system, whether measured by race or gender, is critical to public confidence in the system's fairness. *See Taylor,* 419 U.S. at 530, 95 S.Ct. at 697. A jury is not truly representative of the community unless both sexes have an equal opportunity to serve. *See Ballard v. United States,* 329 U.S. 187, 193–194, 67 S.Ct. 261, 264, 91 L.Ed. 181 (1946). The exclusion of men, or of women, is as incongruous with traditional notions of the jury as a representative body "'composed of the peers or equals of the person whose rights it is selected or summoned to determine,'" as exclusion of a racial minority. *Batson,* 476 U.S. at 86, 106 S.Ct. at 1717 (quoting *Strauder v. West Virginia,* 100 U.S. 303, 308, 25 L.Ed. 664 (1880), *overruled by Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975)).

 It is true that the constitution tolerates gender discrimination if it is substantially related to the achievement of important governmental objectives. *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976). Peremptory strikes are a necessary means for achieving the important governmental objective of impaneling a fair and impartial jury. *See Swain v. Alabama,* 380 U.S. 202, 211–12, 85 S.Ct. 824, 831, 13 L.Ed.2d 759 (1965); *Batson,*

476 U.S. at 123, 106 S.Ct. at 1737 (Burger, C.J., dissenting). A party is not always able to justify his sudden and immediate impression that a particular venireperson will be partial. *See Batson,* 476 U.S. at 123, 106 S.Ct. at 1737; *Lewis v. United States,* 146 U.S. 370, 376, 13 S.Ct. 136, 138, 36 L.Ed. 1011 (1892).

But challenges explained solely by a venireperson's gender are not based on a party's sudden impression of a particular venireperson's ability to be impartial. Rather, like racial challenges, they are based either on the false assumption that members of a certain group are unqualified to serve as jurors, *Batson,* 476 U.S. at 86, 106 S.Ct. at 1717 (citing *Norris v. Alabama,* 294 U.S. 587, 599, 55 S.Ct. 579, 584, 79 L.Ed. 1074 (1935)), or on the false assumption that members of certain groups are unable to consider impartially the case against a member or a nonmember of their group. *Cf. Batson,* 476 U.S. at 89, 106 S.Ct. at 1719 (assumption that members of a certain group are unable to consider a case against a member of their group is false). If the decision to exclude a juror is based solely on the sex of the juror, the decision to exclude must necessarily be based on these false assumptions and does not aid in achieving an impartial jury. *See id.* at 98–99, 106 S.Ct. at 1724 (prohibiting discriminatory peremptory challenges will not undermine the contribution of peremptory challenges to the administration of justice).

We conclude, therefore, that equal protection principles prohibit striking venirepersons on the basis of their gender.

C. *Equal Protection Limits on Criminal Defendants' Peremptory Challenges*

 Our conclusion that equal protection principles prohibit discriminatory strikes of venirepersons based on gender clearly applies to prosecutors. *Id.* at 89, 106 S.Ct. at 1719. *Batson,* however, explicitly left open the question whether equal protection principles limit a criminal defendant's peremptory strikes. *Id.* at 89 n. 12, 106 S.Ct. at 1719 n. 12. A more recent Supreme Court decision, however, has set-

tled the issue. *See Edmonson v. Leesville Concrete Co.,* — U.S. ——, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). We hold that because the evils of discriminatory peremptory strikes result from the misuse of peremptory challenges, regardless of which party strikes the venireperson, the Fifth Amendment similarly limits a federal criminal defendant's peremptory strikes.

Whether the prosecutor or the defendant exercises the strike, the excluded venirepersons are harmed because discriminatory strikes are based on group membership whereas juror competence depends upon an individual's qualifications. And whether the prosecutor or the defendant exercises the strike, public confidence in the judicial system's fairness is undermined by discriminatory strikes. Thus, public respect for our criminal justice system and the rule of law will be strengthened if we ensure that no citizen is disqualified from jury service because of his membership in a constitutionally cognizable group.[9]

De Gross argues, however, that even if *Batson's* rationale logically applies to a criminal defendant's peremptory strikes, such conduct is not fairly attributable to the state, and therefore, the Constitution's guarantee of equal protection does not limit it. We are convinced, however, that a criminal defendant's peremptory strike is state action. We believe that the Supreme Court has mandated such a conclusion in its recent *Edmonson v. Leesville Concrete Co.* decision.

Though *Edmonson* is a civil case, the reasoning is applicable to criminal cases. In *Edmonson,*[10] the Court said that although the conduct of private parties usually is beyond the scope of the Constitution, the defendant's use of peremptory challenges was pursuant to a course of state action and thus subject to constitutional limits. The defendant concrete company used two of its three peremptories to challenge blacks on the panel. When Edmonson, citing *Batson,* asked for a race neutral reason for striking the jurors, the district court denied the request, stating that *Batson* does not apply to civil proceedings.

The Supreme Court determined that the exercise of peremptories was pursuant to a course of state action; thus, *Batson* and the Equal Protection Clause apply to civil litigants. The logic of the decision makes the holding applicable to criminal defendants exercising peremptories. The Court began by noting that "our cases have found state action when private parties make extensive use of state procedures with 'the overt, significant assistance of state officials.'" *Id.* 111 S.Ct. at 2084 (quoting *Tulsa Professional Collection Services, Inc. v. Pope,* 485 U.S. 478, 486, 108 S.Ct. 1340, 1345, 99 L.Ed.2d 565 (1988)). Without the overt, significant participation of the government, the Court said, the entire jury system, including peremptories,[11] could not exist or operate. The government sets up the panel selection procedures. *Id.* 111 S.Ct. at 2084–85. Peremptory challenges are not self-executing. A party seeking to exercise discriminatory peremptory challenges must necessarily rely upon the court to call citizens to serve as jurors, to begin the voir dire in a judicial proceeding, and to excuse challenged venirepersons. We conclude, as the Supreme Court did, that a party could not exercise its peremptories without significant government assistance. "The party who exercises a challenge invokes the formal authority of the court...." *Id.* at 2085. This is true whether the party is a civil defendant or a criminal defendant like De Gross.

---

**9.** Three vivid examples of a defendant's discriminatory use of peremptory strikes harming the system and public confidence are provided in Pizzi, *Batson v. Kentucky: Curing the Disease But Killing the Patient,* 104 S.Ct. Rev. 97, 153 (1987) (discussing race riots and public outrage over three Florida cases involving white or Hispanic defendants acquitted by all white juries after the defendants peremptorily struck all black venirepersons).

**10.** Edmonson was a construction worker injured in a job site accident. He sued the concrete company on the theory that an employee caused his injuries.

**11.** The authorization for peremptories in a criminal case may be found at U.S.C.S. Rule of Criminal Procedure 24 (1991).

The next part of the state actor status inquiry, the *Edmonson* Court said, is whether the act involves the performance of a traditional government function. *Id.* The Court concluded that the exercise of peremptories does involve a traditional governmental function. We believe this is so in a criminal case as well. The jury is a governmental body, selected to carry out governmental functions. Its selection is also governmental; it is in part delegated to private parties but carefully supervised and controlled by the court. "The fact that the government delegates some portion of this power to private litigants does not change the governmental character of the power exercised." *Id.* at 2086.

Thus, the Court said, the selection of jurors through the use of peremptories constitutes state action. "The selection of jurors represents a unique governmental function delegated to private litigants by the government and attributable to the government for purposes of invoking constitutional protections against discrimination...." *Id.* at 2086.. This reasoning applies to all jury selection—including criminal defendants such as De Gross. The basic function of the jury and the manner of its selection do not change fundamentally simply because the case is criminal instead of civil. While it is true that De Gross has not voluntarily availed herself of the jury system, this is not grounds for distinguishing *Edmonson.* The defendant in *Edmonson* had no more chosen to be in court selecting a jury and exercising peremptories than De Gross. The fact is that De Gross, just like the concrete company in *Edmonson,* used her peremptories in an improperly discriminatory manner. Such use is impermissible because she is exercising her government delegated responsibility of selecting a governmental body.

Finally, the *Edmonson* Court noted that injury caused by discriminatory peremptories is exacerbated by the fact that the government allows it to occur in the courthouse—a traditional symbol of governmental authority. *Id.* at 2087. Such injury occurs whether the case involved is civil or criminal.

Here, peremptory challenges are exercised in a public federal building operated in the public interest. And if the trial judge were to accept a peremptory challenge without considering whether the challenge was exercised with discriminatory intent, the trial judge would effectively be abdicating his duty not to discriminate.

The concurrence notes a potential conflict in the logic of considering a defendant a state actor when the defendant is actually an adversary of the state. We find this conflict to be conceptual only. The "state" which the defendant opposes is not the same state actor whose powers he invokes in exercising a peremptory challenge. When exercising a peremptory challenge, the defendant has become a state actor for that limited purpose. If we saw no distinction between the state as the prosecutor and the state as the administrator of the system, we would always see a conflict in criminal cases between the courts and the prosecutor. But we do not see such a problem. While both are state actors, they are distinct entities with distinct and different roles.

The defendant exercising a peremptory challenge invokes the authority of the state as justice administrator. In so doing, the defendant becomes a state actor. But the defendant is still distinct from the state actor that compelled his presence in court and which opposes him. In a criminal prosecution such as this case, both sides may invoke state power and both may therefore be state actors. While it is true that a criminal defendant seeks to "thwart [the state's] power at every stage of the proceedings", *see* concurring opinion at 1445, it is the prosecutor's power, not the court's power, that he seeks to thwart. Here, it is the *court's* power that the defendant invokes. The concurrence fails to note the distinction between the state as prosecutor and the state as court administrator. It is not true, as the concurrence asserts, that the "criminal defendant's interests are diametrically opposed to those of the government." *See* concurring opinion at 1446. The defendant's interests are diametrically opposed to those of the prosecutor. The interests of the state actor administering the trial is to see that justice is done, an

interest not at odds with the defendant's position. Hence, we conclude that the Constitution limits a criminal defendant's peremptory strikes because the defendant's action in striking venirepersons is fairly attributable to the state.[12]

### D. De Gross' Challenge of Tiffany was Gender–Based

A litigant establishes a prima facie case of purposeful discrimination first by showing that a peremptory challenge was exercised against a member of a constitutionally cognizable group. *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723. Second, the litigant must demonstrate that this fact "and any other relevant circumstances raise an inference" that the offending party challenged the venireperson from the jury on account of their group membership. *Id.* The burden then shifts to the party exercising the peremptory challenge to articulate a nondiscriminatory reason related to the case at bar for challenging the venireperson. *Id.* at 97–98, 106 S.Ct. at 1723–24.[13] The district court's findings regarding purposeful discrimination in the jury selection process are findings which we will not set aside unless clearly erroneous. *Id.* at 98 n. 21, 106 S.Ct. at 1724 n. 21; *United States v. Power,* 881 F.2d 733, 739 (9th Cir.1989).

Here, we cannot say that the district court's inference that De Gross challenged Tiffany on account of his gender was clearly erroneous. The challenged venireperson, Tiffany, is a male. Males are a constitutionally cognizable group. *See Craig,* 429 U.S. at 197–99, 97 S.Ct. at 457–58; *Reed v. Reed,* 404 U.S. 71, 75, 92 S.Ct. 251, 253, 30 L.Ed.2d 225 (1971). DeGross used seven of her eight peremptory challenges against males. At the time De Gross challenged Tiffany, ten women and two men were seated in the jury box, and only one man remained in the venire.

Because the prosecutor established a prima facie case of gender discrimination, the burden shifted to De Gross to justify her challenge of Tiffany on neutral grounds. De Gross failed to carry her burden because she refused to explain her challenge. Thus, the district court properly disallowed De Gross' challenge of Tiffany.

## II. Prosecution's Challenge of Tellez

De Gross also argues that the district court erred in allowing the prosecution's peremptory challenge of Tellez, the only Hispanic on the venire. The district court found that DeGross established a prima facie case of race discrimination.

---

12. This reasoning is also consistent with the Supreme Court's decision in *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). In *Polk County,* the Court reaffirmed that "a person acts under color of state law only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Id.* at 317–18, 102 S.Ct. at 449 (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)). The Court found that a public defender appointed to represent a criminal defendant in the appeal of his conviction was not acting under color of state law. Representing a client, the Court said, "is essentially a private function ... for which state office and authority are not needed." *Id.* 454 U.S. at 319, 102 S.Ct. at 450. Key to the decision, however, is that the public defender may act under color of state law while performing some official duties, but not while performing others. Ultimately, an attorney receives his or her authority to represent a client from the client herself, normally making the attorney a private actor. Whether an attorney is selected by an individual or appointed by the state, the ultimate authority to proceed comes from the

client. The client always has the right to fire his or her attorney. On the other hand, when a defendant exercises a peremptory challenge, the ultimate authority to exercise the challenge and exclude a juror comes from the state. Thus the Supreme Court has found state action when a private civil litigant uses the authority of the courts to remove persons from the jury, *see Edmonson,* and we likewise find state action when a private criminal defendant exercises a peremptory challenge.

13. *Batson* also required defendants who allege that a prosecutor violated their equal protection rights by discriminatory peremptory strikes to show that they are members of the same cognizable group as the excluded venireperson to establish a prima facie case. *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723. However, when complaining parties rely on the equal protection rights of the venirepersons and the interests of the general public, it is unnecessary for them to show that they are members of the same cognizable group as the challenged venireperson. *See Powers; see also* discussion in section I.A. of this opinion.

When the district court required the prosecutor to justify his challenge of Tellez, the prosecutor stated that he sought to exclude Tellez because she is a woman and he desired more men on the jury.[14] We find that the prosecutor's justification established a prima facie case of gender discrimination.[15] *See United States v. Lewis,* 837 F.2d 415, 417 (9th Cir.), *cert. denied,* 488 U.S. 923, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988) (a prosecutor's justifications can constitute part of a defendant's prima facie case). It also constitutes an admission of purposeful gender discrimination which, under our holding above, violates De Gross' Fifth Amendment right to the equal protection of the laws. *See Batson,* 476 U.S. at 86–87, 106 S.Ct. at 1717–18 (a prosecutor's discriminatory peremptory challenge violates the defendant's right to equal protection of the laws because the defendant is entitled to be tried by a jury chosen pursuant to nondiscriminatory criteria). The district court, therefore, improperly struck Tellez from the jury.

## CONCLUSION

The district court properly refused to excuse Tiffany when De Gross challenged him because to have done so would have violated the Constitution. However, the district court's acceptance of the government's challenge of Tellez violated De Gross' Fifth Amendment right. We REVERSE De Gross' conviction and REMAND the case for new trial.

REVERSED and REMANDED.

REINHARDT, Circuit Judge, with whom Circuit Judges WALLACE, HUG, SCHROEDER and ALARCON, join, concurring in the judgment:

I agree with the majority that De Gross's conviction must be reversed. However, I do not agree that a criminal defendant is a state actor. Accordingly, I do not join in the majority's reasoning. To the contrary, I base my decision to reverse on the very proposition rejected by the majority in its opinion.

### A

The majority holds that, under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the government may object to the exercise of peremptory challenges by criminal defendants. Central to the majority's holding is its conclusion that those whom the state seeks to incarcerate (or possibly even execute)—the quintessential adversaries of the state—are state actors. If, as I believe, criminal defendants cannot be so characterized, then their actions cannot violate the Constitution, and the government may not assert, as it was permitted to do here, a *Batson* objection to a challenge of a prospective juror made by the defendant. *See Edmonson v. Leesville Concrete Co.,* —— U.S. ——, 111 S.Ct. 2077, 2082, 114 L.Ed.2d 660 (1991). According to the majority, the Supreme Court's decision in *Edmonson* "has settled the issue" in favor of the result they adopt. Opinion at 1439. In so concluding, my colleagues read too much into certain parts of *Edmonson,* ignore other portions, and as a result are led into error regarding *Edmonson's* construction of the state action doctrine.

While I believe that a proper analysis of the state action doctrine will demonstrate that the majority's reading of *Edmonson* is incorrect, it is not surprising that our en banc court is closely divided on the question before us. Support for either result can be found in the language of *Edmonson.* For example, in holding that when

14. We sympathize with the prosecutor's predicament in this case. Faced with a female defendant who was systematically excluding males from the jury, the prosecutor made an understandable effort to balance the gender composition of the jury. However, under our holding in section I of this opinion, we cannot find that the prosecutor's admission constituted a neutral explanation. Hopefully, the prosecutor will find some solace in the realization that upon retrial De Gross' peremptory challenges will not escape constitutional scrutiny.

15. Because we find a prima facie case of gender discrimination, we need not determine whether the district court's determination that De Gross had made a prima facie case of race discrimination was proper.

participating in civil voir dire proceedings involving non-governmental parties only, a private litigant is a state actor, the Court emphasized that the impact on persons excluded from the jury because of their race is heightened by the fact that the peremptory challenges take place in a governmental setting. *See* 111 S.Ct. at 2087 ("[T]he injury caused by the discrimination is made more severe because the government permits it to occur within the courthouse itself."). Since both civil and criminal trials take place within government buildings, the quoted statement can reasonably be said to support the extension of *Edmonson* to the area of criminal proceedings. However, in reaching its conclusion, the *Edmonson* Court also relies on the fact that in civil cases in which the government is not a party, the interests of the private litigants and the government with respect to the voir dire process are congruent. *See id.* at 2086 (noting that "[i]n the jury-selection process, the government and private litigants work for the same end"). Since, as any prosecutor or former prosecutor can attest, the defendant's and the prosecutor's interests in *criminal* cases are in direct conflict at every stage, including that of jury selection, this part of the Court's analysis supports the view that *Edmonson* must be confined to civil proceedings. While, in reaching the anomalous conclusion that criminal defendants are state actors, the majority chooses to emphasize the similarity in civil and criminal cases of the harm to excluded venire persons, I believe the difference in the roles and interests of private civil litigants and criminal defendants is by far the more central and compelling factor.

Although various parts of *Edmonson* may lend support to one side or the other, the one thing the decision does *not* do is "settle the issue". In holding that in certain civil cases, the exercise of peremptory challenges involves state action, the Supreme Court expressly contrasted the private civil litigants whose case it was deciding with criminal defendants—and even with private civil litigants involved in suits against the government. *See* 111 S.Ct. at 2086. The Court thus deliberately distin-

guished the case which now confronts us, and left open its resolution. In short, contrary to the majority's view, the result in the present appeal can in no way be said to be "mandated" by *Edmonson.*

Despite its ambiguities, *Edmonson* does provide guidance in selecting the appropriate analytic framework for resolution of the state action issue. The applicable framework according to *Edmonson* is that used by the Court in *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). *See* 111 S.Ct. at 2082. Under *Lugar,* state action is implicated when "the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in state authority," and when "the private party charged with the deprivation could be described in all fairness as a state actor." *Edmonson,* 111 S.Ct. at 2082–83 (citing *Lugar,* 457 U.S. at 939–42, 102 S.Ct. at 2755–56). Both conditions must be met in order to justify a finding of state action.

The first step—whether the actor asserts a right derived from state law—is easy; because the criminal defendant's power to exercise peremptory challenges stems from Fed.R.Crim.P. 24(b), it has its source in state authority. *See Edmonson,* 111 S.Ct. at 2083. However, it is the second step of the *Lugar* analysis—whether or not the private party can fairly be described as a state actor—that is critical in this case. Although this second step involves a "necessarily fact-bound inquiry," *Lugar,* 457 U.S. at 939, 102 S.Ct. at 2755, that requires "sifting facts and weighing circumstances," *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961), the central determinant of whether a private party—here, the criminal defendant—may be fairly characterized as a state actor is the private party's relationship to the state. *See, e.g., Edmonson,* 111 S.Ct. at 2086 (comparing different state action inquiries based on the "purpose and functions" of the private party in relation to the state).

It cannot be disputed that a criminal defendant's relationship to the state is fundamentally different from that of a private

litigant in a civil case. As the Supreme Court stated in *Edmonson*, private civil litigants present a very different case from criminal defendants because "[i]n the ordinary context of civil litigation in which the government is not a party, an adversarial relation does not exist between the government and a private litigant." 111 S.Ct. at 2086. By contrast, a criminal defendant has perhaps the most adversarial relationship possible with the state. In determining whether De Gross is a state actor, it is not necessary to consider the intermediate circumstance left open by *Edmonson*—that of a private party suing or being sued in a civil action by the government. We must resolve, here, only the most extreme case—whether a criminal defendant being prosecuted by the state can be said to be a state actor.

It is hard to imagine a more palpable example of the exercise of state power than a criminal prosecution. But, that state power is wielded by the prosecutor *against* the criminal defendant—not *by* the defendant on his own behalf. The prosecutor adopts the mission of the state—to convict and incarcerate (or execute) the defendant—as his own, and attempts to further that mission throughout the criminal proceedings. When the prosecutor opposes suppression motions, cross-examines witnesses, or engages in any other trial-related activity, including jury selection, he does so with the object of advancing the state's case and defeating the defendant's efforts to obtain an acquittal.[1]

The defendant's sole objective in a criminal proceeding is to overcome, by all possible adversarial means, the state's effort to convict him. During each and every part of that proceeding, he is interested solely in the preservation of his life and liberty. Indeed, there is no circumstance in which an individual will oppose the interests of the government with greater vigor, consistency, or single-mindedness than during his own criminal trial. Far from wielding state power, a criminal defendant attempts to thwart that power at every stage of the proceedings.

There is nothing about the process of jury selection that alters the criminal defendant's fundamental adversary relationship to the state and allows us fairly to characterize him as a state actor. During the voir dire, the prosecution and defense do not work in harmony; each seeks to eliminate jurors it believes to be sympathetic to the other side and to retain jurors who may be sympathetic to it. Unlike private litigants in civil cases, criminal defendants, when challenging jurors, are inevitably brought into direct conflict with the interests of the state. While conceding that there is a direct conflict between the criminal defendant and the state in the guise of the prosecution[2], the majority elects to ignore that conflict, choosing instead to ask whether another conflict exists—whether the interests of the criminal defendant and those of the court are antithetical. Even when answering that inconsequent question, the majority goes astray. My colleagues assert, naively, "the interests of the state actor administering the trial [the court] is to see that justice is done, an interest not at odds with the defendant's position." Opinion at 1441. The realities are to the contrary. The defendant's interest is not "to see that justice is done" but to obtain an acquittal *regardless of the interests of justice*. Certainly, in at least a substantial percentage of our criminal proceedings, the defendant's interest is directly contrary to the state's—even if we close our eyes to the role of the prosecutor and view the state's interest as being solely

---

1. I do not mean to suggest that the prosecutor does not have a duty to see that justice is done and fairness prevails in every criminal trial. The contrary is certainly the case. In fact, there is no excuse for a prosecutor's failure to be guided by those obligations at all times. Nevertheless, although a prosecutor must ensure both that justice is done and that the means he employs are fair, his immediate objective, unless and until he decides to terminate the prosecution, is to obtain a conviction.

2. See Opinion at 1441 ("While it is true that a criminal defendant seeks to 'thwart [the state's] power at every stage of the proceedings', *see* concurring opinion at 1445, it is the prosecutor's power, not the court's power, that he seeks to thwart.").

that of the court.[3] The conflict between the state and the criminal defendant is real and not "conceptual",[4] whether we consider the state to be the prosecutor, the court, or, as is in fact the case, both. It is the reality of that conflict that is determinative for purposes of the state action doctrine; and it is that reality that mandates the finding that criminal defendants are not state actors.

I conclude that the fact that a criminal defendant's interests are diametrically opposed to those of the government is dispositive of the state action question. When the Supreme Court found that doctors employed by government institutions are state actors, it did so because "[i]nstitutional physicians assume an obligation to the mission that the State, through the institution, attempts to achieve." *Polk County v. Dodson*, 454 U.S. 312, 320, 102 S.Ct. 445, 451, 70 L.Ed.2d 509 (1981) (explaining *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), and *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). When it found that public defenders are *not* state actors, it did

so because it is the function of public defenders to oppose the state's mission in criminal trials. *See id.* When the Court found that private civil litigants engaged in lawsuits not involving the government are state actors for purposes of the jury selection process, it found their actions "attributable to the government" because "the government and private litigants work for the same end" during the voir dire. *Edmonson*, 111 S.Ct. at 2086. At the very least, it is plain that there is no substantial conflict between the government and the private litigant in civil cases in which the government is not a party. In complete contrast, when a criminal defendant exercises peremptory challenges, he works in direct opposition to the interests of the state; he seeks a jury that will be hostile to the government's efforts to convict him. Unlike institutional physicians, a criminal defendant does not "assume an obligation to the mission" of the state. And, unlike civil litigants in a non-governmental case, a criminal defendant does not "work for the same end" as the government.[5] In sum, a

**3.** Since a criminal prosecution is brought in the name of the state, and is even captioned *United States v. (the criminal defendant)*, it is difficult to see how we could, under any form of reasoning, eliminate from our analysis the state's role as prosecutor.

**4.** What is "conceptual" is the majority's view that the court's only role is to seek justice. From a criminal defendant's more pragmatic standpoint, the court is part of the governmental machinery that seeks to incarcerate or execute him. Following conviction, the court is the body that orders that his life or liberty be taken from him. The congruence of interests the majority sees between the court and the accused is not visible to most defendants who are processed through our criminal justice system.

**5.** In conducting its state action inquiry, the majority examines the role of the criminal defendant rather than the defense counsel. This is in accord with *Edmonson*, which looks to the function and interests of the litigants rather than of their lawyers. However, even were we to analyze the issue from the standpoint of counsel, the result would be the same.

The interests of defense counsel are no less diametrically opposed to those of the state than the interests of defendants; the difference between the two is simply that the former acts under a constitutional obligation rather than a sense of self-preservation. "An indispensable

element" of defense counsel's duty to his client is " 'the ability to act independently of the Government and to oppose it in adversary litigation.' " *Dodson*, 454 U.S. at 318 n. 8, 102 S.Ct. at 450 n. 8 (quoting *Ferri v. Ackerman*, 444 U.S. 193, 204, 100 S.Ct. 402, 409, 62 L.Ed.2d 355 (1979)). Although defense counsel are also officers of the court, in criminal cases that obligation is primarily served by opposing the interests of the state. The American Bar Association rules of professional ethics state that "[t]he basic duty [criminal] defense counsel owes to the administration of justice and as an officer of the court is to serve as the accused's counselor and advocate with courage and devotion and to render effective, quality representation." ABA Standards for Criminal Justice, Standard 4–1.2(b). The degree to which the state may impose obligations on the defense lawyer is sharply limited by the Constitution, which bars the state from diverting him from his central obligation—that of seeking to vindicate the defendant's interests. *See Dodson*, 454 U.S. at 321–22, 102 S.Ct. at 451–52 ("[I]t is the constitutional obligation of the State to respect the professional independence of the public defenders whom it engages."). The requisite independence of the criminal defense lawyer is incompatible with the view that the lawyer is simultaneously a state actor. As the Supreme Court stated in *von Moltke v. Gillies*, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948) (plurality):

criminal defendant can by no means and under no circumstances fairly be said to be acting on behalf of the state—to be a "state actor".[6]

Because De Gross's peremptory challenge to Wendell Tiffany did not involve state action, the district court should not have permitted the government to raise a *Batson* objection. Thus, the court erred in disallowing De Gross's challenge and permitting Tiffany to serve on the jury. The district court's error in seating Tiffany over De Gross's objection is in and of itself sufficient to require reversal of De Gross's conviction and a new trial before a properly selected jury.[7]

### B

My belief that a criminal defendant's exercise of his or her peremptory challenges cannot give rise to a violation of the Constitution does not mean that I lack empathy for the feelings of venire persons excluded from serving on the jury on the basis of race or gender. It is true, as the majority states, that the setting in which the voir dire occurs—in a courtroom under the supervision of a district judge—may give rise to a feeling of government-sponsored discrimination. However, that concern may be alleviated without discarding the state action doctrine or turning criminal defendants into government agents. I am confident that a district judge who fears, in a particular case, that venire persons are likely to be excluded on the basis of race or gender and that they may ascribe their exclusion to the actions of the state, can develop means of averting that misimpression. For example, district judges are free, prior to commencement of the voir dire, to explain to prospective jurors that the defendant is given the opportunity to exclude persons for any reason whatsoever—or for none—and that a decision to strike is that of the defendant's alone and in no way represents the view of, or an action by, the court. In this way, even the appearance of state action that might arise from a defendant's exercise of peremptory challenges could be avoided.

To the degree that an individual venire person may nonetheless be affronted by an arbitrary exclusion, the harm suffered must be weighed against the need of the criminal defendant to have the right to exercise peremptory challenges in any manner he chooses, whether as a result of instinct, logic, reason, unfounded suspicion, bias or a combination of any or all of those factors. In a criminal trial, it is the defendant's rights with which we must be most concerned, to which we must pay the greatest heed: it is, after all, the defendant's life or liberty that is at stake in the courtroom. The majority's holding diminishes those rights by imposing constitutional constraints on a defendant's ability to select the jury he believes will be most sympathetic to his cause.[8]

> A paradox, A paradox,
> A most ingenious paradox!
> Later in the same refrain our authors observe,
> How quaint the ways of Paradox!
> At common sense she gaily mocks!

---

The Constitution does not contemplate that prisoners shall be dependent upon government agents for legal counsel and aid, however conscientious and able those agents may be. Undivided allegiance and faithful, devoted service to a client are prized traditions of the American lawyer. It is this kind of service for which the Sixth Amendment makes provision.

*Id.* at 725–26, 68 S.Ct. at 324 (footnote omitted). Accordingly, criminal defense lawyers, like their clients, are not state actors.

**6.** Knowledge that a criminal defendant who is seeking to escape incarceration (or execution) by the state may be termed a "state actor" would have delighted Gilbert and Sullivan, those well-respected commentators on the absurdities found in our legal system. *See Trial by Jury.* In Act II of *The Pirates of Penzance,* we find one of their most famous lines, one that well describes the majority holding:

**7.** In view of the conclusion expressed above, there is no reason to consider, in this opinion, whether *Batson* extends to gender-based peremptory challenges.

**8.** It is the members of racial and ethnic minorities who are markedly overrepresented in the role of criminal defendants. Thus, it is those members who will suffer disproportionately from the rule the majority adopts today. *See Edmonson v. Leesville Concrete Co., Inc.,* ——— U.S. ———, 111 S.Ct. 2077, 2095, 114 L.Ed.2d 660 (1991) (Scalia, J., dissenting); *Developments in the Law—Race and the Criminal Process,* 101 *Harv.L.Rev.* 1475, 1495 (1988).

Criminal defendants are given the opportunity to exercise unrestricted peremptory challenges for the simple reason that we have long believed that the right to do so is essential to ensuring the impartiality of the jury, an impartiality upon which our ability to provide fair trials depends. *See Lewis v. United States*, 146 U.S. 370, 376–78, 13 S.Ct. 136, 138–39, 36 L.Ed. 1011 (1892) ("The right of [peremptory] challenge ... has always been held to be essential to the fairness of trial by jury.... 'and it must be exercised with full freedom, or it fails of its full purpose.'" (quoting *Lamb v. State*, 36 Wis. 424, 427 (1874)). If criminal defendants are required to explain publicly, or even to attempt to understand privately, precisely why they have a concern about how a particular juror may view their case, much of the benefit of the peremptory challenge system will be lost. Hunches and instinct have always been good enough reason for a defendant to refuse to trust his life or liberty to the judgment of a stranger whose demeanor or manner causes him anxiety or discomfort. In many cases it is simply impossible for a criminal defendant to state why his "gut" tells him not to trust a particular person. Requiring explanations when challenges are made to blacks, women, and members of other groups would seriously limit the historic right of criminal defendants to be tried by a jury in whose fairness they have confidence. *Compare Batson*, 476 U.S. at 97–98, 106 S.Ct. at 1723–24 (discussing legitimate bases for the prosecutor to challenge a juror peremptorily). As the Supreme Court made plain in *Pointer v. United States*, 151 U.S. 396, 14 S.Ct. 410, 38 L.Ed. 208 (1894), "[t]he right to challenge a given number of jurors without showing cause is one of the most important of the rights secured to the accused.... Any system for the empanelling of a jury that prevents or embarrasses the full, unrestricted exercise by the accused of that right, must be condemned." *Id.* at 408, 14 S.Ct. at 414. In sum, I believe that the result the majority arrives at is not only contrary to logic and reason but hampers the public interest in fair trials.

Conclusion

For the reasons explained above, I agree with the majority that the district court's judgment must be reversed. For those same reasons, I concur in the judgment only.